J-S06042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER A. CORNELIUS | : | |
| | : | |
| Appellant | : | No. 861 MDA 2022 |

Appeal from the Judgment of Sentence Entered May 24, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003328-2019

BEFORE: STABILE, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: MARCH 15, 2023**

Appellant Christopher A. Cornelius appeals from the judgment of sentence entered in the Court of Common Pleas of Berks County following his conviction by a jury on two counts of homicide by vehicle, one count of aggravated assault by vehicle, two counts of involuntary manslaughter, three counts of recklessly endangering another person, one count of possession of drug paraphernalia, two counts of driving while under the influence of a

_____

[*] Former Justice specially assigned to the Superior Court.

controlled substance ("DUI"),[1] and various summary traffic offenses.[2]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: After his arrest in connection with a fatal automobile accident, Appellant, who was represented by counsel, proceeded to a jury trial. Donelle Truglia testified that, in June of 2019, she, her ex-husband, and her daughter (collectively "the Truglias"), all of whom lived in Kentucky, were visiting her mother in Bloomfield, New Jersey, when her vehicle was repossessed. N.T., 4/11/22, at 119.  Ms. Truglia asked Appellant, who was also a Kentucky resident, to pick them up in New Jersey and drive them back to Kentucky. *Id.*

On June 28, 2019, Appellant arrived at Ms. Truglia's mother's home, and after Appellant took a shower, the Truglias departed Bloomfield at 10:00 p.m. in Appellant's vehicle with Appellant at the wheel. *Id.* at 121. Ms. Truglia testified "the car ride was decent" while they were traveling west on I-78 until Appellant began "swerving in and out of traffic driving at high speed." *Id.*  Ms.

---

[1] 75 Pa.C.S.A. § 3732(a), 75 Pa.C.S.A. § 3732.1(a), 18 Pa.C.S.A. § 2504(a), 18 Pa.C.S.A. § 2705, 35 P.S. § 780-113(a)(32), and 75 Pa.C.S.A. § 3802(d)(1)(ii)-(iii), respectively.

[2] Specifically, Appellant was convicted of following too closely, driving at safe speed, careless driving, careless driving-unintentional death and serious bodily injury, and reckless driving. *See* 75 Pa.C.S.A. §§ 3310(a), 3361, 3714(a)-(c), and 3736(a).  We note Appellant was acquitted on the charges of homicide by vehicle while DUI, aggravated assault by vehicle while DUI, DUI-controlled substance-impaired ability, exceeding maximum speed limit by 45 mph, and failing to use safety belt. *See* 75 Pa.C.S.A. §§ 3735(a), 3735.1(a), 3802(d)(2), 3362, and 4581.

Truglia testified she was "nervous" and asked Appellant to "slow down; stop doing that." *Id.* Ms. Truglia eventually dozed off, but she awoke when Appellant slammed the vehicle's brakes to avoid hitting the rear of the car traveling in front of them. *Id.* at 122. Ms. Truglia indicated she "had enough" and was "too scared to stay in the car with him." *Id.* Accordingly, Ms. Truglia demanded Appellant stop the vehicle at the first rest stop when they entered Pennsylvania from New Jersey. *Id.* at 123.

Ms. Truglia told Appellant she refused to drive with him to Kentucky unless he allowed her to drive. *Id.* After approximately forty-five minutes, at 1:00 a.m. on June 29, 2019, Appellant drove away leaving the Truglias in the rest stop parking lot. *Id.* at 125. Ms. Truglia called a taxi service, and the family spent the night at a hotel near Allentown, Pennsylvania. *Id.* at 126. Ms. Truglia testified she never heard from Appellant again; however, while they were sleeping at the hotel, Appellant called her ex-husband's cell number and left a voicemail message at around 3:30 a.m. or 4:00 a.m. *Id.* at 127. In the message, Appellant reported he "got into a bad car accident." *Id.*

After hearing the voicemail message at 8:00 a.m. on June 29, 2019, Ms. Truglia called the police to inquire about the accident, as well as Appellant's condition. *Id.* at 128. In response, state troopers came to the hotel and interviewed Ms. Truglia, who gave the troopers a statement consistent with her trial testimony. *Id.* at 128-30.

Meanwhile, at some point after leaving the Truglias at the rest stop, Appellant reversed his westward course and began traveling in the eastbound lane of I-78. Lisa Winter testified that, at approximately 2:30 a.m. on June 29, 2019, she, her husband, and her son departed from their home in Schuylkill County and began traveling in their hardtop Jeep Wrangler towards Wildwood Crest, New Jersey. *Id.* at 138. Mr. Winter was driving with Mrs. Winter in the front passenger seat and their son in the back seat. *Id.* The Winters traveled on Route 61 south and took the exit onto I-78 east towards Allentown. *Id.* at 139-40. Mrs. Winter testified there were no adverse weather conditions, and traffic was light on I-78 east. *Id.* at 140.

Mrs. Winter testified that, as the family traveled in the right lane between exits 40 and 45, bright lights appeared from behind in the driver's side-view and rearview mirrors. *Id.* at 139-40. She indicated the lights came upon their Jeep "real fast" and then their Jeep was suddenly hit. *Id.* at 140-42. Mrs. Winter testified "the force of the impact" lifted their Jeep off the ground, onto the guide rails, and over a steep embankment. *Id.* at 140-41. The Jeep "free-fell down to a ledge and went into a hard roll." *Id.* at 140.

Mrs. Winter testified the following occurred:

> It just became very loud. Glass was ricocheting all over the place. I remember my head being bashed around. You could hear churning of metal. The coils were bouncing on the Jeep. And everything in the [Jeep] was silent except for me. I was screaming, "God, please stop the roll; God, please stop the roll." And I—at one point, it just seemed like it was going on forever like a nightmare that ever ends.

- 4 -

*Id.* at 142.

Mrs. Winter never lost consciousness. *Id.* When the vehicle stopped rolling, it came to rest in shallow water. *Id.* Mrs. Winter "turned to the side to look for [her] husband on the driver's side, and he wasn't there." *Id.* Mrs. Winter was unable to open the passenger side door, so she crawled onto the driver's side. *Id.* She began calling for help while yelling for her husband and son. *Id.* at 144-45. Suddenly, she saw two police officers with flashlights walking down the embankment towards her, and she was removed from the scene suffering from a broken neck, concussion, deep cuts, and shock.[3] *Id.* at 145-46. At trial, she denied seeing a tractor trailer in the area prior to the crash, and she testified her husband did not make any lane changes. *Id.* at 141.

Pennsylvania State Police Trooper Dominick Marino testified that, after receiving a dispatch, he and his partner, Trooper Robert Markowski, arrived at the accident scene in Greenwich Township, Berks County, Pennsylvania, on June 29, 2019, at approximately 3:24 a.m. *Id.* at 153. He testified that, at this location, I-78 is a highway with two lanes dedicated for traveling east and two lanes dedicated for traveling west. *Id.* at 154. The eastbound and

---

[3] The parties stipulated that, if called to testify, Joseph Stirparo, M.D., would testify he is the chief of trauma surgical critical care and acute surgery care at the Lehigh Valley Health Network, and on June 29, 2019, at 5:00 a.m., Mrs. Winter arrived at the Lehigh Valley Hospital emergency room following a motor vehicle crash. *Id.* at 150. Mrs. Winter suffered fractures to her sixth and seventh cervical vertebra. *Id.*

westbound lanes are separated by a concrete median barrier. *Id.* The accident occurred in a non-active construction zone where the speed limit was posted at either 50 or 55 mph. *Id.* He indicated there were no adverse weather conditions, and the road was straight with no "sight-line issues." *Id.* at 155.

Upon arrival at the accident scene, Trooper Marino observed Appellant's vehicle sitting in a "final resting" position by the "concrete barrier separating east and west traffic, faced in a northeastern direction." *Id.* at 154. Appellant was standing near the guide rail, and he "flagged down" the police. *Id.* at 155. Appellant pointed down towards the embankment and yelled "there's someone down there or there's a car down there." *Id.* at 157.

The trooper did "a quick triage of [Appellant], asking him if he was injured." *Id.* Appellant did not complain of any injuries. *Id.* at 159. The troopers then used their flashlights to look down the steep embankment and heard Mrs. Winter screaming for help. *Id.* at 158. They observed the crashed Jeep sitting in the stream. *Id.* at 159. With some difficulty, the troopers traversed down the steep embankment, and they moved Mrs. Winter, who was semi-ambulatory, approximately 25 yards from the Jeep. *Id.* at 161.

Alerting the troopers that her husband and son were in the Jeep, the troopers began looking for them. *Id.* The troopers found Mr. Winter and the couple's son not too far on the northern side of where the Jeep had come to its final resting place. *Id.* at 163. The troopers discovered no signs of life, and it was clear they were deceased. *Id.*

Trooper Marino testified the ambulance arrived soon thereafter, and Mrs. Winter was removed from the scene. *Id.* at 164. Meanwhile, the troopers went back up the embankment and asked Appellant what had happened. *Id.* at 165. Trooper Marino testified as follows:

> At first, [Appellant] was having trouble recalling what happened prior to the crash and during the crash. But he indicated about a truck, a tractor trailer, the trailer unit of the tractor trailer, he said that's what he remembered, the last thing that he remembered was seeing that and trying to swerve away from that.

*Id.*

Trooper Marino noted there was no tractor trailer stopped at the scene, and no tractor trailer driver called in to report the accident. *Id.* at 166. Trooper Marino did not perform a field sobriety test on Appellant; however, he asked Appellant to take a breathalyzer after he was in the ambulance. *Id.* at 170. The breathalyzer was negative for alcohol. *Id.*

Trooper Markowski testified consistently with Trooper Marino as to his observations at the crash scene. N.T., 4/12/22, at 186-208. He noted Appellant was "very sporadic" in his speaking. *Id.* at 196. He did not observe any drug paraphernalia at the scene or detect an odor of alcohol from Appellant. *Id.* at 198. He did not witness Appellant take any drugs at the scene. *Id.* He did not observe any adverse weather conditions. *Id.* at 202. He noted that, based on the seriousness of the crash, he called for the State Police's accident reconstruction unit to respond. *Id.* at 203.

Samuel Yerkes, who is an ambulance driver and EMT, testified he responded to the crash scene at approximately 4:30 a.m. N.T., 4/11/22, at 175.  He observed Appellant's vehicle had damage to the front end. *Id.* He indicated he asked Appellant what happened, and Appellant pointed to "skid marks that were going off into the guardrail." *Id.* at 176. Mr. Yerkes looked down the embankment and saw the Jeep. *Id.*

Mr. Yerkes testified he and a paramedic attended to Appellant, who reported "he was driving from out of state all night, wasn't really sure if he fell asleep or not and then,…he had tried to avoid a collision but [he] wasn't really sure how it exactly happened." *Id.* at 178.  Mr. Yerkes testified Appellant was given an IV with "normal saline" at the scene; however, he denied Appellant was given "methamphetamine or amphetamine drugs." *Id.* at 180.

Pennsylvania State Police Trooper Justin Humanick, who was a member of the forensic services unit, testified he responded to the crash scene at approximately 5:30 a.m. when the sun was starting to rise.  N.T., 4/12/22, at 214. He took several pictures of the scene, including of the major front-end damage to Appellant's vehicle, the tire marks on the roadway, and the damage to the guide rail on the right berm. *Id.* at 214-15, 220. His pictures revealed the front end of Appellant's vehicle had "a transfer on the hood of the letter G-O-O-D in the same font as the Goodyear Wrangler [spare] tire on the rear

of the [Winters'] Jeep." *Id.* at 221. He also took pictures of the steep embankment and the Winters' severely damaged Jeep. *Id.*

Moreover, Trooper Humanick testified that he noticed, in plain view, two syringes in the dash area of Appellant's vehicle. *Id.* at 222. Accordingly, he secured and executed a search warrant on Appellant's vehicle after it was towed to the Hamburg police barracks impound lot. *Id.* In addition to seizing the two syringes from the dash area, Trooper Humanick discovered a syringe underneath the driver's side seat, as well as rolling papers and a digital scale in the center console. *Id.* He also found a package of unopened syringes in the rear seat, as well as two elastic bands and a Sharps container with nine syringes in the trunk. *Id.* at 224, 228.

Mikayla Lentz, a registered nurse at the Lehigh Valley Hospital, testified she drew blood from Appellant at the emergency room at 5:17 a.m. on June 29, 2019. *Id.* at 235-37.

The parties stipulated that Appellant's "blood sample was tested by Forensic Toxicologist Michael Lamb and found to contain 370 nanograms per milliliter of methamphetamine and 72 nanograms per milliliter of amphetamine." *Id.* at 244.

Pennsylvania State Police Corporal Anthony Garipoli, a member of the vice narcotics unit, was offered by the Commonwealth as an expert in controlled substances. *Id.* at 249. Corporal Garipoli testified he examined the two syringes seized from Appellant's vehicle's dash, as well as the one syringe

seized from underneath the driver's seat. *Id.* at 251. He "observed dried blood" on the needle portion of two of the three syringes. *Id.*

He testified to a reasonable degree of professional certainty that people use digital scales to weigh drugs, needles to inject methamphetamine when it is in liquid form, and elastic bands to "pump the veins up" to inject the needle into a vein. *Id.* at 252. He testified it is not uncommon for methamphetamine users to buy the amount they are going to use, so there are no "remnants of the actual drug" on their person. *Id.* at 254. He acknowledged it was uncommon for a user of illegal drugs to carry a Sharps container to dispose of their needles. *Id.* at 257.

Pennsylvania State Police Trooper Alyssa Becker testified she conducted a post-crash investigation of Appellant's vehicle and the Winters' Jeep. She opined that, prior to the crash, both vehicles would have passed state inspection. *Id.* at 271. She observed no defects in either vehicle's brakes or tires. *Id.*

Pennsylvania State Police Corporal Timothy Cutshaw, who is a member of the accident reconstruction unit, arrived on the scene at 5:15 a.m. on June 29, 2019. He opined to a reasonable degree of scientific and professional certainty as follows regarding the cause of the instant crash:

> [T]he crash occurred as a 2012 Chevy Captiva operated by [Appellant]…was traveling east on Interstate 78 in the right lane. [Appellant] was unable to avoid impacting a 2018 Jeep Wrangler due to the high rate of speed of his vehicle. The 2012 Chevy Captiva struck the 2018 Jeep Wrangler in an offset rear-end collision that was traveling east on Interstate 78 in the right lane.

This impact forced the 2018 Jeep Wrangler off the roadway striking the right-side guide rail and continuing over the guide rail. The 2018 Jeep Wrangler continued down a steep embankment rolling multiple times, ejecting the driver and rear-seat passenger.

The front-seat passenger remained in the vehicle where it came to rest in a stream. The 2012 Chevy Captiva continued to an uncontrolled rest on the left shoulder. The two occupants that were ejected [from the Jeep Wranger]…were killed as a result of the crash. The front-seat passenger, [Mrs.] Winter, sustained major injuries from the crash.

\*\*\*

The speed for the 2012 Chevy Captiva was determined from the Bosch Crash Data Retrieval Report to be 98 miles per hour, 98 miles per hour, 99 miles per hour, 99 miles per hour, and 95 miles per hour from 2 and a half seconds to .5 seconds before the crash—or before the impact with the 2018 Jeep Wrangler. It was taken in half-second intervals. The report was validated through ignitions cycles and physical evidence at the scene.

\*\*\*

The speed for the 2018 Jeep Wrangler was determined from the Bosch Crash Data Retrieval Report to be 55 miles per hour at the time of impact with the 2012 Chevy Captiva. Utilizing an in-line momentum equation for that vehicle, I actually came up with 57 miles per hour in math not using the Bosch Crash Data Retrieval Report.

\*\*\*

The speeds reported in the Jeep report that I think are accurate are pretty consistent with highway speeds between 65 and 55 miles per hour. There's nothing suddenly changing until after the impact occurs. The impact occurs and, obviously, the vehicle starts—goes hard right. And that's based upon the impact with the Captiva….The offset is what caused the [Jeep] to go to the right. So that impact is what caused that. The offset as the vehicle approaches, to me, looks like both vehicles were in the right lane, the Captiva is coming up on the Jeep fast and decides, oh, I got to get over to the left lane. And then that's when the impact occurs.

*Id.* at 286-88, 322-23.

- 11 -

He noted he saw no evidence a third vehicle was involved in the crash. *Id.* at 291, 322. Specifically, he saw no evidence Appellant's vehicle hit any vehicle other than the Winters' Jeep. *Id.* at 292. Further, based on the impact of the vehicles and evidence at the scene, Corporal Cutshaw opined the evidence did not suggest a tractor trailer was in the left lane and Appellant made a quick turn to the right lane to avoid it, thus hitting the Winters' Jeep. *Id.* at 365. He also noted he saw no evidence the Winters' Jeep lost control or made a quick lane change prior to the crash. *Id.* at 292, 322. He opined the Winters' Jeep was traveling "straight" when Appellant's vehicle hit it in an offset position from behind "as if performing a lane change." *Id.* at 327. Moreover, he saw no physical evidence that Appellant hit the brakes of his vehicle any earlier than a half-second before hitting the Winters' Jeep. *Id.* at 293. He saw no evidence Mr. Winter suddenly hit the brakes of the Jeep before Appellant hit him from behind. *Id.* at 300, 321. He specifically testified the tire marks he observed were "postimpact tire marks." *Id.*

Additionally, Corporal Cutshaw testified he examined both vehicles and found no mechanical issues, which may have led to the crash. *Id.* at 294. He also examined the roadway, which was straight, and found no defects. *Id.* at 297. He observed no evidence that adverse weather conditions contributed to the accident. *Id.*

Michael Coyer, Ph.D., who was offered by the Commonwealth as an expert in forensic toxicology and pharmacology, testified to a reasonable

degree of scientific certainty that Appellant was impaired by methamphetamine at the time of the crash. *Id.* at 379, 398. He explained the amphetamine in Appellant's blood resulted from Appellant's body metabolizing methamphetamine. *Id.* at 382. He explained that 370 nanograms per millimeter of methamphetamine, which was the amount found in Appellant's blood after the accident, is "a high number" resulting in "impairment to a normal state." *Id.* at 382-83. He noted methamphetamine, which is a Schedule II controlled substance, has "psychoactive effects," leads to "erratic driving," and is addictive. *Id.* at 384. He testified it is a "central nervous system simulant," which raises a person's heart rate, affects vision, and has euphoric effects. *Id.* at 385. He explained that a person gets "100 percent efficiency of the drug when [it is] injected." *Id.* at 386. He opined that, given the high amount of amphetamine in Appellant's blood, Appellant "multiple dosed" with the methamphetamine prior to the accident. *Id.* at 394-96. He opined, to a reasonable degree of scientific certainty, that Appellant's use of methamphetamine was a direct and substantial factor in causing the crash. *Id.* at 398.

The parties stipulated that, if called to testify, Deputy Coroner Sarah Shivers would testify she went to the accident scene at 4:44 a.m. on July 29, 2019, and she pronounced Mr. Winter and his son dead. N.T., 4/13/22, at 425.

Supriya Kuruvilla, M.D., who is the director of the division of autopsy and forensic pathology at the Reading Hospital, testified he performed autopsies on Mr. Winter and his son. He opined, to a reasonable degree of medical certainty, that the cause of death for both men was massive blunt-force trauma from a motor vehicle accident. *Id.* at 431-32. He collected tissue samples from Mr. Winter, who was the driver of the Jeep. *Id.* at 434. Aside from the presence of caffeine, Mr. Winter's toxicology was negative for any drugs or alcohol. *Id.*

After the Commonwealth rested, the defense called a single witness, Donald Phillips, an engineer who specializes in accident reconstruction and event data recorder extraction analysis. He acknowledged the right front of Appellant's vehicle impacted the rear left of the Winters' Jeep. *Id.* at 474. He also acknowledged that Appellant's vehicle was traveling between 95 mph and 98 mph in the seconds before the crash. *Id.* at 483. However, based upon his analysis of the evidence from the crash scene, as well as the data recorder, he testified it was impossible to preclude the possibility that the Winters' Jeep was changing lanes, aggressively braking, or entering the road from the shoulder when Appellant's vehicle hit it. *Id.* at 471, 474, 485. He testified there was no way of knowing "what the Jeep was doing in the seconds leading up to the crash." *Id.* at 481.

On cross-examination, he admitted high speeds can be the sole proximate cause in crashes. *Id.* at 486. He admitted a driving speed of 99

mph is not a safe speed for a roadway posted at 50 mph. *Id.* at 489. He also admitted that, in the instant case, he observed no defects in the road where the crash occurred, and there was no evidence of anything obstructing a driver's line of sight in that area. *Id.* at 490.

At the conclusion of all evidence, the jury convicted Appellant of the offenses indicated *supra*. Following a sentencing hearing, on May 24, 2022, the trial court sentenced Appellant to, *inter alia*, an aggregate of 11.25 years to 22.5 years in prison. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant presents the following issue in his "Statement of Questions Involved" (verbatim):

> A. Was insufficient evidence presented to establish the required *mens rea* of recklessness or gross negligence as required to sustain Appellant's convictions of Aggravated Assault by Vehicle 75 Pa.C.S.A. § 3721.1, Homicide by Vehicle, 75 Pa.C.S.A. § 3732?

Appellant's Brief at 5 (suggested answer omitted).

Appellant contends the evidence was insufficient to sustain his convictions for aggravated assault by vehicle and homicide by vehicle.[4] Specifically, Appellant avers that "[a]n essential element of both is that the predicate offenses required must be committed in a reckless and/or grossly negligent fashion." Appellant's Brief at 12. Appellant avers the evidence

---

[4] Appellant presents no challenge to his remaining convictions.

reveals that, at most, he was "simply negligent," and, thus, the Commonwealth failed to meet its burden of proving the necessary *mens rea* required for aggravated assault by vehicle and homicide by vehicle. *Id.*

Initially, in reviewing Appellant's sufficiency claim, we are mindful of the following well established legal precepts:

This Court's standard of review when considering a challenge to the sufficiency of the evidence requires us to look at the evidence in a light most favorable to the verdict winner and determine whether the evidence presented, actual and/or circumstantial, was sufficient to enable a fact-finder to find every element of the crime charged, beyond a reasonable doubt. *See Commonwealth v. O'Brien*, 939 A.2d 912 (Pa.Super. 2007).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and the circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Id.* at 913–914 (quotation omitted). The finder of fact is free to believe all, some, or none of the evidence presented and is free to determine the credibility of the witnesses. *Commonwealth v. Dailey*, 828 A.2d 356 (Pa.Super. 2003).

Appellant was convicted of aggravated assault by vehicle under 75 Pa.C.S.A. § 3732.1, which relevantly provides as follows:

> **(a) Offense.--**Any person who recklessly or with gross negligence causes serious bodily injury to another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic, except section 3802 (relating to driving under influence of alcohol or controlled substance), is guilty of aggravated assault by vehicle, a felony of the third degree when the violation is the cause of the injury.

75 Pa.C.S.A. § 3732.1(a) (bold in original).

Further, Appellant was convicted of homicide by vehicle under 75 Pa.C.S.A. § 3732, which relevantly provides as follows:

> **(a) Offense.--**Any person who recklessly or with gross negligence causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic except section 3802 (relating to driving under influence of alcohol or controlled substance) is guilty of homicide by vehicle, a felony of the third degree, when the violation is the cause of death.

75 Pa.C.S.A. § 3732(a) (bold in original).

As Appellant contends, to prove the offenses under Subsections 3732.1(a) and 3732(a), the Commonwealth must prove beyond a reasonable doubt that "a defendant's conduct was either reckless or grossly negligent."[5] *Commonwealth v. Sanders*, 259 A.3d 524, 529 (Pa.Super. 2021) (*en banc*). *See Commonwealth v. Wyatt*, 203 A.3d 1115 (Pa.Super. 2019); *Commonwealth v. Matroni*, 923 A.2d 444 (Pa.Super. 2007).

---

[5] Appellant does not challenge the remaining elements for the offenses.

This Court has recognized that the state of mind of gross negligence under the aggravated assault by vehicle and homicide by vehicle statutes is the same as recklessness. **Sanders**, 259 A.3d at 531-32; **Wyatt**, 203 A.3d at 1118; **Matroni**, 923 A.2d at 448. Thus, to sustain Appellant's convictions for these two offenses in the case *sub judice*, the Commonwealth was required to prove Appellant acted recklessly.

> The Crimes Code defines recklessness as follows:
>
> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
>
> 18 Pa.C.S.A. § 302(b)(3). Recklessness requires proof that the defendant both had actual knowledge of a substantial and unjustifiable risk and disregarded that risk despite that knowledge. **Sanders**, 259 A.3d at 531–32; **Commonwealth v. Sitler**, 144 A.3d 156, 164 (Pa.Super. 2016) (*en banc*).
>
> > Recklessness "implicates knowledge in two ways: (1) the actor must consciously (*i.e.*, with knowledge) disregard a substantial and unjustifiable risk; and (2) the risk that the actor disregards is measured by the circumstances known to the actor." "Conscious disregard" of a risk, in turn, "involves first becoming aware of the risk and then choosing to proceed in spite of the risk."

**Commonwealth v. Fretts**, 271 A.3d 383, 389 (Pa.Super. 2021) (quoting **Sanders**, 259 A.3d at 532).

Here, in a light most favorable to the Commonwealth, as verdict winner,

we conclude Appellant's actions evidenced a conscious disregard of the substantial and unjustified risk that he would be involved in a traffic accident causing serious bodily injury and death. ***See id.***

For example, the evidence reveals that, in the hours leading up to the accident, Appellant picked up the Truglias in New Jersey, and after he "swerv[ed] in and out of traffic driving at high speed," and slammed on his vehicle's brakes to avoid hitting the rear of a car traveling in front of them, the Truglia family refused to continue riding with Appellant. N.T., 4/11/22, at 121. Thus, at 1:00 a.m. on June 29, 2019, Appellant left the Truglia family at a rest stop in Allentown, Pennsylvania, and he continued with his journey solo.

Approximately two hours later, Appellant, while driving on a straight stretch of road and traveling from 95 to 98 mph in a posted 50 mph zone, hit the rear of the Winters' Jeep, which was traveling approximately 55 mph in the right-hand lane. Corporal Cutshaw, a member of the state police accident reconstruction unit, testified the evidence showed Appellant did not hit the brakes of his vehicle any earlier than a half-second prior to hitting the Winters' Jeep in an offset position as if performing a lane change. Mrs. Winter confirmed Appellant's vehicle came upon the rear of the Jeep "real fast." ***Id.*** at 140. She noted her husband, who was driving the Jeep, made no lane changes before the accident, there were no adverse weather conditions, and there were no other vehicles, including a tractor trailer, in the area prior to the crash.

Moreover, in the immediate aftermath of the accident, Appellant admitted to EMT Yerkes that he had been "driving from out of state all night [and] wasn't really sure if he fell asleep or not[.]" *Id.* at 178. The blood taken from Appellant at the emergency room at 5:17 a.m. revealed he had a level of 370 nanograms per milliliter of methamphetamine in his blood. Dr. Coyer testified this is a "high number" resulting in "impairment to a normal state." N.T., 4/12/22, at 382-83. He noted methamphetamine has "psychoactive effects" and leads to "erratic driving." *Id.* at 384-85. It also affects vision. *Id.* at 385. Dr. Coyer opined Appellant had used multiple doses of methamphetamine prior to the accident. Corporal Garipoli, a member of the vice narcotics unit, noted two of the syringes seized from the interior of Appellant's vehicle contained "dried blood" on the needle portion. *Id.* at 251. Corporal Garipoli noted methamphetamine may be injected into the body, and Dr. Coyer testified that, when the drug is introduced into the body in this manner, the user gets "100 percent efficiency of the drug[.]" *Id.* at 386.

Based on the aforementioned, we conclude the Commonwealth proved Appellant had actual knowledge of a substantial and unjustifiable risk, and he consciously disregarded the risk. *See Fretts*, *supra*. Simply put, we disagree with Appellant that the evidence revealed he was, at most, negligent. Rather, we conclude "[h]is cumulative conduct was reckless, and the evidence supports the jury's finding that he was guilty of [aggravated assault by vehicle

and] homicide by vehicle beyond a reasonable doubt." **Matroni**, 923 A.2d at 449.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2023